**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.:** _____ |
| | : | |
| **v.** | : | **Violations:** |
| | : | |
| **OH SUNG KWON, a/k/a** | : | **18 U.S.C. § 201 (Bribery of a** |
| **THOMAS KWON,** | : | **Public Official)** |
| | : | |
| **Defendant.** | : | **18 U.S.C. § 371 (Conspiracy to Commit** |
| | : | **Bank Fraud)** |
| | : | |
| | : | **18 U.S.C. § 2 (Aiding and Abetting** |
| | : | **and Causing an Act to be Done)** |
| | : | |
| | : | **26 U.S.C. § 7203 (Willful Failure to** |
| | : | **File Return)** |
| | : | |
| | : | **18 U.S.C. § 982(a)(2)(A) (Criminal** |
| | : | **Forfeiture)** |

**I N F O R M A T I O N**

The United States Attorney charges:

**Relevant Entities and Individuals**

1.      The defendant, OH SUNG KWON, a/k/a THOMAS KWON ("KWON"), was the co-founder and Chief Financial Officer of Avenciatech, Inc.  ("Avenciatech").  KWON controlled Avenciatech.

2.      Avenciatech was incorporated in Virginia on or about February 26, 2009. Avenciatech maintained its corporate headquarters in Annandale, Virginia.  Since in or about October 2009, Avenciatech was a government contractor that obtained subcontracts to provide services to the United States Department of the Army.

3.      The United States Army's Program Executive Office Enterprise Information Systems ("PEO EIS") was a bureau within the Department of the Army that provided infrastructure and

information management systems to the Army.  The Project Manager, Defense Communications and Army Transmission Systems ("PM DCATS"), was a division of PEO EIS.

4.      Public Official C was an Assistant Project Manager for PM DCATS.   While employed at PM DCATS, Public Official C was a public official.  Until in or about May 2010, Public Official C resided and worked in Seoul, South Korea.   During that time period, Public Official C was the Contracting Officer Technical Representative ("COTR") for a task on a prime contract with the Eighth United States Army, Command and Control C4IT Technical Support Services, prime contract number W15P7T-06-D-E407 (the "Prime Contract").   Since in or about May 2010, Public Official C resided in Fairfax Station, Virginia, and worked at Fort Belvoir, Virginia.  Public Official C became a public official in or about July 1990.

5.      Company F was the prime contractor for the Prime Contract.  Company F maintained offices in Eatontown, New Jersey.

6.      NICK PARK, a/k/a NOCHOL PARK ("PARK"), was the co-founder and President of Unisource Enterprise Inc. ("UEI").    UEI maintained its corporate headquarters in Annandale, Virginia.  From in or about September 2008 through in or about December 2008, UEI was a government contractor that obtained a subcontract through the Prime Contract to provide services to the Department of the Army.

7.      From in or about December 2008 through in or about February 2010, Company E was a government contractor that obtained subcontracts through the Prime Contract to provide services to the Department of the Army.  Company E maintained offices in Ashburn, Virginia.

8.      Co-Conspirator 4 ("CC-4") was a former employee of UEI and, later, Company E. In or about December 2009, CC-4 left Company E and became the Vice President-Operations of Avenciatech.

9.      Co-Conspirator 6 ("CC-6") was a former employee of UEI and, later, Company E. At the same time that CC-6 was an employee of Company E, CC-6 controlled Company I.  Company I was a subcontractor to Company E.

10.     Company G was a government contractor that obtained subcontracts through the Prime Contract to provide services to the Department of the Army.  Company G maintained offices in Bohemia, New York.  Employee G-1 was the President and Chief Executive Officer of Company G.

11.     Company J was a government contractor with offices in Seoul, South Korea. Company J obtained subcontracts from Company E and Avenciatech to provide services to the Department of the Army.  Employee J-1 was the President and Chief Executive Officer of Company J.

12.     Co-Conspirator 5 ("CC-5") was a settlement agent at a real estate settlement, title, and escrow company, with offices in Annandale, Virginia.

13.     Co-Conspirator 7 ("CC-7") was a settlement agent at a real estate settlement, title, and escrow company (hereafter referred to as "Company H"), with offices in Annandale, Virginia. CC-7 controlled Company H.

14.     The United States Army Corps of Engineers ("USACE") was a branch of the Department of the Army made up of approximately 34,000 civilian and military personnel.  The Headquarters for the USACE was located at 441 G Street, N.W., in the District of Columbia.  The

USACE administered the Technology for Infrastructure, Geospatial, and Environmental Requirements ("TIGER") Contract.  The TIGER Contract was a vehicle that authorized federal government agencies and departments used to purchase products and services.

15.     KERRY F. KHAN ("KHAN") was a Program Manager with the USACE at Headquarters in Washington, D.C.  As part of his duties as a public official, KHAN was involved in, among other things, placing subcontracts for USACE through the TIGER Contract.  While a USACE employee, KHAN was a public official.

16.     Nova Datacom, LLC ("Nova Datacom") was a government contractor that obtained subcontracts under the TIGER Contract and the Prime Contract to provide services to USACE and the Department of the Army.  Nova Datacom maintained its corporate headquarters in Sterling, Virginia and, later, in Chantilly, Virginia.

17.     YOUNG N. CHO, also known as ALEX N. CHO ("CHO"), was the Chief Technology Officer of Nova Datacom.

18.     Nova Datacom Employee A was the President of Nova Datacom.

19.     THEODOROS N. HALLAS ("HALLAS") was the Executive Vice President of Nova Datacom.

**The Bribery Schemes and the Attempted Cover Up**

20.     KWON introduced CHO and Nova Datacom Employee A to CC-5.  CC-5 arranged for CHO and Nova Datacom Employee A to provide checks to CC-5's clients in exchange for cash. KWON learned from CHO and Nova Datacom Employee A that some of the cash obtained by CHO and Nova Datacom Employee A from CC-5's clients, which totaled approximately $700,000, was given to KHAN in exchange for KHAN steering contracts and subcontracts to Nova Datacom.

21.     KWON learned from PARK that PARK obtained a subcontract for UEI by agreeing to pay bribes to Public Official C in exchange for Public Official C steering the subcontract to UEI.

22.     KWON obtained subcontracts for Avenciatech by agreeing to make, and by making, bribe payments to Public Official C in exchange for Public Official C steering the subcontracts to Avenciatech.  At KWON's request, CHO made payments to Public Official C in exchange for Public Official C steering subcontracts to Avenciatech.

23.     In or about January 2011, after KWON had paid bribes to Public Official C, KWON learned from CHO that HALLAS was under federal criminal investigation for submitting false past performance references to federal agencies to obtain government contracts for Nova Datacom.  In or about February 2011, CHO told KWON that CHO intended to meet with HALLAS to obtain a status report from HALLAS on the criminal investigation.  Following CHO's meeting with HALLAS, CHO sent a text message to KWON in Korean that stated, in substance, "I'm fucked." KWON understood from CHO's message that HALLAS was cooperating with the criminal investigation and HALLAS's cooperation would implicate CHO.

24.     In or about February 2011, CHO met with KWON to discuss the criminal investigation.  CHO told KWON that CHO intended to cooperate in the criminal investigation and to voluntarily disclose certain information to the federal investigators.  CHO also told KWON about a subpoena for documents that Nova Datacom had received as part of the criminal investigation. CHO explained to KWON that Nova Datacom's responses to the subpoena would lead to the discovery of payments to KHAN and Public Official C.  KWON was worried that the criminal investigation would lead to KWON's payments to Public Official C and to Nova Datacom's payments to KHAN through CC-5.

25.     KWON and CHO agreed that CHO would not tell the investigators about PARK or Public Official C in an attempt to keep the investigation from leading to KWON and others.  For the same reason, KWON and CHO also agreed to delete e-mails referencing Public Official C.  With CHO's assistance, KWON deleted e-mails referencing Public Official C and CHO from KWON's personal e-mail account and KWON's e-mail account at Avenciatech.  During the period in which CHO agreed to attempt to keep the investigation from leading to KWON, CHO expressed an intent to work for KWON after CHO got out of prison.

26.     Through June 2011, CHO and KWON met following CHO's meetings with the criminal investigators to discuss the information disclosed by CHO and the direction of the investigation.  Nova Datacom Employee A participated in some of those meetings.  KWON understood from those meetings that CHO provided false information to the criminal investigators to protect KWON and others.  Following a meeting at a sauna between KWON and CHO, during which KWON suspected that CHO was being followed, KWON and CHO agreed not to meet to discuss CHO's disclosures to the investigators.

27.     On August 18, 2011, at the request of Nova Datacom Employee A, KWON met CHO and Nova Datacom Employee A at Nova Datacom's offices.  During the meeting, CHO intentionally and silently motioned to KWON that CHO was wearing a recording device.  CHO also wrote down on a piece of paper that KWON should say back to CHO, in substance, "tell them the truth."  CHO showed the piece of paper to KWON.  As prompted by the directions written down by CHO on the piece of paper, KWON told CHO, in substance, to "tell them the truth" in response to questions put to KWON by CHO.  During the meeting, KWON mentioned Public Official C.  In response, CHO silently motioned to KWON to refrain from discussing Public Official C.  KWON understood that

the intent of CHO's messages was to protect KWON in the criminal investigation.   KWON

voluntarily disclosed CHO's conduct to investigators on November 3, 2011.

### The Avenciatech Bribery Scheme

28.    In or about early 2009, KWON learned from CC-4 that PARK and UEI were having

difficulty fulfilling a subcontract for a task overseen by Public Official C.   KWON and CC-4

discussed establishing a company for KWON to obtain government contracts.   In or about February

2009, KWON established Avenciatech for the purpose of obtaining government contracts.

29.    KWON knew from CC-4 and PARK that KWON would have to make payments to

Public Official C in exchange for Public Official C directing subcontracts from the Army to

Avenciatech.   In or about February 2009, KWON traveled to South Korea to meet Public Official

C.   CC-4 introduced KWON to Public Official C.   KWON and CC-4 agreed that KWON would offer

to Public Official C an ownership interest in Avenciatech, which KWON did during KWON's

meeting with Public Official C.   In exchange for Public Official C's ownership interest in

Avenciatech, Public Official C agreed to use Public Official C's official position to steer

subcontracts from the Army through Company F to Avenciatech.   KWON and Public Official C

agreed that Public Official C would obtain the benefit of Public Official C's undisclosed ownership

interest in Avenciatech after Public Official C left the government.   Thereafter, Public Official C

provided KWON with information concerning potential subcontracts.

30.    During a second trip to Korea in or about October 2009, KWON met with CC-4 and

Public Official C.   During the meeting, KWON, CC-4, and Public Official C agreed that KWON and

Public Official C would each have a 40% ownership interest in Avenciatech, CC-4 would have a

10% ownership interest in Avenciatech, and 10% would be left in reserve.

31.     KWON and CC-4 established e-mail accounts for Public Official C at Avenciatech. To conceal Public Official C's identity, Public Official C was given the aliases "Philip Kim" and "Chris So" to use as the names of Public Official C's e-mail addresses at Avenciatech.  The purpose of the e-mail accounts was to facilitate communications between KWON, CC-4, and Public Official C concerning confidential bid information.

32.     On or about September 30, 2009, with Public Official C's assistance, Avenciatech obtained a subcontract under the Prime Contract, Purchase Order number S3064-0009, in the initial amount of $366,844.80, with an initial period of performance from 09/30/09-01/31/10.  Public Official C provided KWON and CC-4 with confidential bid information to include in the subcontract proposal.  From on or about December 30, 2009 through on or about December 1, 2010, with Public Official C's assistance, the Army approved six Change Orders to Purchase Order number S3064-0009.  The Change Orders required Avenciatech to provide additional services on the subcontract, which increased the subcontract value to $1,913,059.22, and extended the period of performance until February 26, 2011.

33.     On or about February 11, 2011, Avenciatech obtained a second subcontract under the Prime Contract, Purchase Order number 11-0001055, in the initial amount of $551,093.50, with an initial period of performance from 02/11/11-07/11/11.  On or about April 21, 2011, the Army approved a Change Order to Purchase Order number 11-0001055 that required Avenciatech to provide additional services under the subcontract, which increased the subcontract value to $1,143.513.05, and extended the period of performance until August 12, 2011.

34.     From on or about October 3, 2011 through on or about October 4, 2011, KWON attended a meeting at a hotel in Baltimore, Maryland with Public Official C, Employee G-1, and

other employees of Company G.  During the meeting, Public Official C provided confidential bid information to KWON, Employee G-1, and other employees of Company G to assist Company G in preparing a bid solicitation for an upcoming contract.  Avenciatech intended to be a subcontractor to Company G once the contract was awarded.  The purpose of the meeting was to provide Company G with an unfair advantage over other potential bidders for the contract.

35.     In exchange for Public Official C's official assistance in steering subcontracts and attempting to steer subcontracts to Avenciatech, KWON provided the following things of value, directly and indirectly, to Public Official C:

a.      In or about July 2009, KWON paid $40,000 in cash to Public Official C. KWON borrowed the $40,000 from CC-7.  As directed by Public Official C, KWON obtained repayment of the $40,000 cash payment from CC-4 and CC-6 while they were working for Company E.  CC-6 obtained money to repay KWON by submitting invoices from Company I to Company E. After Company E paid the invoices submitted by Company I, which totaled in excess of $40,000, CC-6 caused Company I to make five separate wire transfers, each in the amount of $7,500, for a total amount of $37,500, from Company I's account to an account in the name of KWON's associate.  KWON's associate, in turn, repaid approximately $40,000 to CC-7.

b.      In or about August 2009, KWON paid $1697.71 for Public Official C's hotel stay at The W Hotel in Fort Lauderdale, Florida.

c.      In or about December 2009, CHO and KWON paid, collectively, approximately $30,000 for Public Official C and seven close family members of Public Official C to travel to and stay at the Atlantis Hotel in Nassau, Bahamas.

d.      From in or about June 2010 through in or about June 2011, KWON provided a cellular telephone and payments for cellular telephone service to Public Official C.  In or about June 2011, KWON and Public Official C agreed to change the name of the subscriber for the cellular telephone service from one of KWON's companies to Public Official C because of their concern about the criminal investigation of Nova Datacom.

e.      In or about July 2010, KWON paid $1,568.52 for a rental van for Public Official C and close family members of Public Official C to use.

f.      In or about July 2010, KWON assisted Public Official C to obtain financing to purchase a home in Fairfax Station, Virginia.  As part of the transaction, Public Official C made a down payment of $230,000 for the home purchase.  Public Official C did not want to make the down payment directly from Public Official C's account, however, because Public Official C would have to provide copies of Public Official C's bank statements, which had a large number of cash deposits made into the account.  As a result, Public Official C transferred $230,000 from an account in the name of Public Official C to an account in the name of an Avenciatech employee.  KWON caused the Avenciatech employee, in turn, to execute a phony "Gift Letter" to transfer the $230,000 to the settlement company to apply to the purchase price of Public Official C's home.  The "Gift Letter" falsely referred to Public Official C as the "cousin" of the Avenciatech employee.  Public Official C knew the "Gift Letter" was fictitious.

g.      In or about August 2010, a close family member of Public Official C wanted to purchase a 2010 Lexus RX450H automobile for $52,438.97.  Public Official C's close family member was not employed at the time.  KWON agreed that Public Official C's close family member could falsely represent on the finance application for the Lexus RX450H that Public Official C's

close family member was an employee of one of KWON's companies.  KWON also submitted false pay stubs to the finance company purporting to reflect payments from KWON's company to Public Official C's close family member for employment verification.  Public Official C's close family member obtained financing for the Lexus RX450H.

      h.      In or about August 2010, KWON agreed to finance the purchase of a 2010 Lexus LS460 automobile, valued at $69,394.28, in the name of the spouse of an Avenciatech employee.  The Lexus LS460 was intended for the benefit of two other close family members of Public Official C.  As directed by Public Official C, KWON provided the Lexus LS460 to Public Official C for the intended use of Public Official C's close family members.  From in or about August 2010 through in or about March 2011, KWON caused monthly finance payments to be made for the Lexus LS460 totaling $11,106.66.  In or about March 2011, Public Official C returned the Lexus LS460 to KWON because of their concern about the criminal investigation of Nova Datacom.

      i.      From in or about September 2010 through in or about March 2011, KWON paid $7000 in cash per month to Public Official C.  KWON and Public Official C agreed to cease the cash payments because of their concern about the criminal investigation of Nova Datacom.

      j.      In or about February 2011, as requested by Public Official C, KWON paid $15,000 in cash to Public Official C.  KWON and Public Official C agreed that KWON would obtain reimbursement for the payment by submitting a fraudulent invoice to Company F.

      k.      Between 2009 and 2011, KWON paid for female escort services for Public Official C in Seoul, South Korea, New York City, and Atlanta.

**COUNT ONE**
**(Bribery of a Public Official)**

36.     Paragraphs 1 through 35 of this Information are realleged and incorporated by reference as if set out in full.

37.     From in or about February 2009 to in or about October 2011, in a continuing course of conduct, in the District of Columbia and elsewhere, the defendant, OH SUNG KWON, a/k/a THOMAS KWON, did, directly and indirectly, corruptly give, offer, and promise things of value to a public official, namely Public Official C, and corruptly offered and promised things of value to Public Official C personally and to other persons and entities as directed by Public Official C, with the intent to influence official acts, to influence Public Official C to commit and aid in committing, collude in, and allow fraud, and make opportunity for the commission of fraud on the United States, and to induce Public Official C to do and omit to do acts in violation of Public Official C's lawful duties, to wit, KWON gave, offered, and promised in excess of $200,000 for Public Official C's benefit in return for Public Official C using Public Official C's official assistance to direct subcontracts to Avenciatech and providing preferential treatment for Avenciatech with potential subcontracts awarded through the Army.

**(Payment of a Bribe to a Public Official, in Violation of Title 18, United States Code, Sections 2 and 201(b)(1)(A), (B), and (C))**

**COUNT TWO**
**(Conspiracy to Commit Bank Fraud)**

38.     Paragraphs 1-4, 13, and 35.f of this Information are realleged and incorporated by reference as if set out in full.

39.     ING Bank and Bank of America were financial institutions with deposits insured by the Federal Deposit Insurance Corporation.

40.     These banks, along with other non-bank mortgage companies (collectively referred to as "lenders"), were in the business, among other things, of loaning money to individuals who used their houses to secure the loans.  These loans were to:

      a.      purchase a home where the lender loaned a lump sum to pay the seller;

      b.      refinance a loan where the lender provided funds to pay off the original loan and, in some cases, pay out additional funds; or

      c.      obtain a line of credit (known as a "home equity line of credit") where an individual paid off an original loan and/or took periodic cash advances up to a specified maximum amount of money (with additional funds available to be drawn against the line of credit if the individual paid back some of the borrowed money).

41.     The lenders required persons who borrowed money to purchase residential real estate or who sought to obtain a refinancing or a line of credit (collectively, "buyers") to complete a loan application, which listed the individual's assets and liabilities, including real estate property owned and loans associated with each property.  Lenders relied upon the individual to be truthful in these loan applications.  Lenders would not loan money in excess of the available equity in the property securing the loan because if the individual failed to repay the loan, the lenders' recourse would be to foreclose on the loan, take possession of the property, and resell the property in an attempt to recover as much of the outstanding loan amount as possible.

42.     Buyers could choose to work with a mortgage broker, who advised the buyers about various loan products available from various lenders.  Mortgage brokers did not work for any one lender, but were paid by the lender if the buyer received a mortgage loan from that lender.

43.     Onyx Financial Services ("Onyx Financial"), with offices in Annandale, Virginia, was a mortgage broker.  Kwon was the Operations Manager for Onyx Financial.  Kwon controlled Onyx Financial.  Onyx Financial employed loan officers who met with the buyers and completed

loan applications, known as a Uniform Residential Loan Application or Form 1003.  In addition to completing these loan applications, the loan officers collected information from the buyers about their employment, assets, liabilities, and credit history in order to aid the mortgage lender in determining whether the buyers were qualified for a loan and were willing to repay the loan.

44.     In order to approve a mortgage loan, lenders required:

a.     that the buyers document that they had sufficient monthly income and assets to pay the mortgage and to make the required cash contribution toward the purchase of the property;

b.     a truthful Uniform Residential Loan Application;

c.     verification from the buyers' banks confirming that the buyers had cash available to make the mortgage payments; and

d.     a cash contribution (also known as "cash from borrower") to purchase the property.

45.     Lenders of mortgage loans typically did not lend money for the full purchase price of the property.  Rather, lenders normally made loans for less, and required that the buyers use some of their own funds to purchase the property.  Those down payments gave the lenders assurance that the buyers, with some of their own money invested in the property, had an incentive to remain current on their mortgage payments to avert foreclosure, and that the lenders would be able to recover the full proceeds of the loan in the event of foreclosure.

46.     Loans were processed and settled by title and escrow companies.  It was the job of the title and escrow company to research the public land records filed on the property for liens to determine, among other things, whether the property was pledged as collateral for any other loan.  The title and escrow company would also be responsible for holding the lender's money in escrow, paying out the money according to the lender's directions, and acting as the fiduciary of the lender.

-14-

47.     If a loan were approved, the lenders instructed a title company to prepare for a "settlement," that is, a meeting where the buyer and seller signed the Deed (transferring legal title), Note (promise to pay the loan), Deed of Trust (public notice that the property is encumbered with a mortgage), Settlement Statement (an accounting of the disbursement of loan money and a listing of cash due from the buyer, which was commonly referred to as a "HUD-1"), and other documents. The lender provided the settlement agent with instructions on how to secure the bank's interest in the property.

48.     At the settlement, the title company received the loan money from the mortgage lender and the buyer's cash contribution.  Thereafter, the title company paid the costs of the settlement, debts of the property or seller, and any other authorized expenses.

49.     If buyers used their homes as collateral to secure a loan, then as a condition to loaning money, the lenders typically required that all previous loans on the property be paid off and closed by the title and escrow company and that the notice of the debt be removed from the appropriate land records so that there would be no other liens which could take precedence over the lender's lien.  The lender would require that a Deed of Trust be signed and filed in the land records.

## The Conspiracy

50.     From in or before January 2004, and continuing thereafter through at least September 2010, in the District of Columbia and elsewhere, the defendant, OH SUNG KWON, a/k/a THOMAS KWON, did unlawfully, willfully, and knowingly conspire, combine, confederate, and agree with other persons both known and unknown to commit offenses against the United States, namely, bank fraud, accomplished by KWON's engaging in a scheme to defraud and obtain money and property

from financial institutions by means of false and fraudulent pretenses, representations, and promises, in violation of 18 U.S.C. §§ 1344 and 2.

## Goal of the Conspiracy

51.     It was a goal of the conspiracy that defendant OH SUNG KWON, a/k/a THOMAS KWON, and his co-conspirators would defraud lenders of money by obtaining mortgage loans on properties through false loan applications, forged documents, and fraudulent settlements, with such loans generating large cash proceeds for the defendant.

## Manner and Means

52.     It was a part of the conspiracy that KWON and others, using Onyx Financial, recruited buyers who did not provide the requisite cash at settlement, did not expect to fund the mortgage payments themselves, and did not intend to live in the properties after purchase ("straw buyers").

53.     It was a further part of the conspiracy that KWON and others, using Onyx Financial, provided false documentation to the lenders, such as false verifications of deposit, false verifications of employment, and forged Uniform Residential Loan Applications and other documents, causing the lenders to believe that the buyers had the means and the willingness to pay the mortgages.

54.     It was a further part of the conspiracy that KWON and others, including, at certain times, CC-7, using Onyx Financial, provided false documentation to the lenders, including Settlement Statements and "title binders," which falsely identified the number of encumbrances on properties and the intent of the buyers to pay off pre-existing encumbrances on properties, causing the lenders to believe that there were no other liens that could take precedence over the lenders' liens.

55. It was a further part of the conspiracy that at settlement, for properties personally controlled by KWON, CC-7 at certain times disbursed the loan money to KWON without first receiving the "cash from borrower" and paying off pre-existing encumbrances on properties.

56. During the course of the conspiracy, and in the manner described above, KWON was involved in at least six fraudulent real estate sales and refinances, including the ones listed below, with loan amounts of approximately $1,802,000:

| Address | Date of Settlement | Loan Amount (approximate) |
|---|---|---|
| 2520 Rambling Road, Vienna, Virginia | December 22, 2008 | $427,000 |
| 2520 Rambling Road, Vienna, Virginia | September 2, 2010 | $417,000 |
| 2901 Charing Cross Road, Apartment Number 11, Falls Church, Virginia | April 13, 2010 | $112,000 |
| 8183 Carnegie Hall Court, Apartment Number 308, Vienna, Virginia | October 15, 2009 | $232,500 |
| 10744 Beechnut Court, Fairfax Station, Virginia | July 23, 2010 | $613,500 |

**Overt Acts**

57.     In furtherance of the conspiracy and to effect the objects thereof, the defendant OH

SUNG KWON, a/k/a THOMAS KWON, and other members of the conspiracy committed the

following overt acts, among others, in the District of Columbia and elsewhere:

**2520 Rambling Road, Vienna, Virginia**

a.     On or about December 22, 2008, the defendant arranged for a refinancing of

2520 Rambling Road, Vienna, Virginia, through ING Bank, using as collateral the property at 2520

Rambling Road, which was already encumbered with mortgages held by two lenders.  The loan

documents contained numerous false statements, including a statement that the property at 2520

Rambling Road was encumbered with one loan, when in fact the property was encumbered by two

loans.  ING Bank approved a loan of $427,000 on the condition that the pre-existing loan be paid,

closed, and the land records department be notified of the closure so that no additional money could

be borrowed on the prior loan.  CC-7 tricked ING Bank into believing that the pre-existing loan had

been paid off and the lien in the public record had been released.  Rather than pay off the existing

mortgage on the property, as instructed by ING Bank as a condition of the loan, CC-7 wired the loan

amount to KWON.

b.     On or about September 2, 2010, the defendant arranged for a straw buyer to

purchase 2520 Rambling Road, Vienna, Virginia, through Just Mortgage, Inc. ("Just Mortgage"),

a non-bank mortgage company, using as collateral the property at 2520 Rambling Road, which was

already encumbered with mortgages held by three lenders.  The property was purchased by a straw

buyer in the name of CC-7's close family member.  The loan documents contained numerous false

statements, including a statement that CC-7's close family member intended to live in the property.

The loan documents also falsely stated that the property at 2520 Rambling Road was encumbered with one loan, that being an ING Bank loan, when in fact the property was encumbered by three loans. Just Mortgage approved a loan of $417,000 on the condition that the ING Bank loan be paid, closed, and the land records department be notified of the closure so that no additional money could be borrowed on the ING Bank loan. CC-7 tricked Just Mortgage into believing that the ING Bank loan had been paid off and the lien in the public record had been released. Rather than pay off the existing mortgage on the property held by ING Bank, as instructed by Just Mortgage as a condition of the loan, CC-7 wired the loan amount to KWON.

### 2901 Charing Cross Road, Apartment Number 11, Falls Church, Virginia

c.      On or about April 13, 2010, the defendant arranged for a straw buyer to purchase 2901 Charing Cross Road, Apartment Number 11, Falls Church, Virginia, through Just Mortgage, using as collateral the property at 2901 Charing Cross Road, which was encumbered by a loan from Bank of America. The property was originally owned, on paper, in the names of KWON's close family members. The straw purchaser was another one of KWON's close family members. Just Mortgage approved a loan of $112,000 on the condition that the Bank of America loan be paid off and closed and the lien in the public record be "released" so that no additional money could be borrowed on the Bank of America loan, and so that there would be no other loans that would take precedence over the Just Mortgage loan. CC-7 tricked Just Mortgage into believing that the Bank of America loan had been paid off and the lien in the public record had been released. Rather than pay off the existing mortgage on the property held by Bank of America, as instructed by Just Mortgage as a condition of the loan, CC-7 wired the loan amount to KWON.

**8183 Carnegie Hall Court, Apartment 308, Vienna, Virginia**

d.       On or about October 15, 2009, the defendant arranged for a straw buyer to purchase 8183 Carnegie Hall Court, Apartment 308, Vienna, Virginia, through Just Mortgage, using as collateral the property at 8183 Carnegie Hall Court, which was already encumbered by a loan from Bank of America. The property was originally owned, on paper, in the name of KWON's close family member. The straw purchaser was a relative of one of KWON's business associates. Just Mortgage approved a loan of $232,500 on the condition that the Bank of America loan be paid off and closed and the lien in the public record be "released" so that no additional money could be borrowed on the Bank of America loan, and so that there would be no other loans that would take precedence over the Just Mortgage loan. CC-7 tricked Just Mortgage into believing that the Bank of America loan had been paid off and the lien in the public record had been released. Rather than pay off the existing mortgage on the property held by Bank of America, as instructed by Just Mortgage as a condition of the loan, CC-7 wired the loan amount to KWON.

**10744 Beechnut Court, Fairfax Station, Virginia**

e.       In July 2010, KWON assisted Public Official C to obtain financing to purchase a home in Fairfax Station, Virginia. As part of the transaction, Public Official C made a down payment of $230,000 for the home purchase. Public Official C did not want to make the down payment directly from Public Official C's account, however, because Public Official C would have to provide copies of Public Official C's bank statements, which had a large number of cash deposits made into the account. As a result, Public Official C transferred $230,000 from an account in the name of Public Official C to an account in the name of an Avenciatech employee. KWON caused the Avenciatech employee, in turn, to execute a phony "Gift Letter" to transfer the $230,000 to the

settlement company to apply to the purchase price of Public Official C's home.  The "Gift Letter"

falsely referred to Public Official C as the "cousin" of the Avenciatech employee.  Public Official

C knew the "Gift Letter" was fictitious.  A copy of the fictitious "Gift Letter" was faxed to the

lender's agent in the District of Columbia to secure a loan of $613,500 on the property.

> **(Conspiracy to Commit Bank Fraud, in Violation of Title 18, United States Code, Sections 2 and 371)**

### COUNT THREE
### (Willful Failure to File a Tax Return)

58.     Paragraphs 1 through 35 of this Information are realleged and incorporated by

reference as if set out in full.

59.     Aeon Consulting Group, Inc. ("Aeon Consulting") was a corporation controlled by

KWON with offices in Annandale, Virginia.  Aeon Consulting received income from real estate and

mortgage transactions and, beginning in 2010, from Nova Datacom related to government contracts.

60.     Onyx Consulting Services, Inc. ("Onyx Consulting") was a corporation controlled

by KWON with offices in Annandale, Virginia.  Onyx Consulting received income from real estate

and mortgage transactions.

61.     The Internal Revenue Service (hereinafter referred to as the "IRS") was an agency

of the United States Department of Treasury responsible for the ascertainment, computation,

assessment, and collection of federal taxes.

62.     During the calendar year 2010, the defendant, OH SUNG KWON, a/k/a THOMAS

KWON, had and received gross income totaling in excess of $100,000.  By reason of that gross

income, he was required by law, following the close of the calendar year 2010 and on or before

April 15, 2011, or at such other time as allowed by the IRS as a result of an extension, to make an

income tax return to the IRS Service Center, at Atlanta, Georgia, to a person assigned to receive returns at the local office of the IRS at Atlanta, Georgia, or to another IRS office permitted by the Commissioner of Internal Revenue, stating specifically the items of his gross income and any deductions and credits to which he was entitled.  KWON obtained an extension from the IRS until September 30, 2011 to make an income tax return.  Well knowing and believing all the foregoing, he did willfully fail, on or about September 30, 2011, to make an income tax return, in violation of Title 26, United States Code, Section 7203.

**(Willful Failure to File a Tax Return, in Violation of Title 26, United States Code, Section 7203)**

## FORFEITURE ALLEGATION

1.      The allegations set forth in Count Two of this Information are re-alleged as though set forth fully herein and incorporated by reference for the purpose of alleging forfeiture to the United States of America pursuant to the provisions of Title 18, United States Code, Section 982(a)(2)(A).

2.      As a result of the offense alleged in Count Two of this Information, the defendant shall forfeit to the United States any property constituting, or derived from, proceeds the defendant obtained directly or indirectly, as the result of the offense.

3.      The property to be forfeited includes, but is not limited to, the following:

**Money Judgment**

$1,188,500, which is equal to the value of the property, constituting, or derived from, proceeds the defendant obtained directly or indirectly as the result of the offense.

4.      By virtue of the commission of the felony offense charged in Count Two of this Information, any and all interest that defendant has in any property constituting, or derived from,

proceeds the defendant obtained directly or indirectly, as the result of the offense is vested in the United States and hereby forfeited to the United States pursuant to Title 18, United States Code, Section 982(a)(2)(A).

5.      If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

a.      cannot be located upon the exercise of due diligence;

b.      has been transferred or sold to, or deposited with, a third person;

c.      has been placed beyond the jurisdiction of the Court;

d.      has been substantially diminished in value; or

e.      has been commingled with other property that cannot be subdivided without difficulty;

it is the intention of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendant up to the value of said property listed above as being subject to forfeiture.

**(Criminal Forfeiture, Title 18, United States Code, Section 982(a)(2)(A))**.

RONALD C. MACHEN JR.
United States Attorney
In and For the District of Columbia

By:    _____

MICHAEL K. ATKINSON
D.C. Bar No. 430517
BRYAN SEELEY
D.C. Bar No. 501681
Assistant United States Attorneys
Fraud and Public Corruption Section
555 4th Street, N.W.
Washington, D.C.  20530
202.252.7817 (Atkinson)
202.252.1749 (Seeley)
Michael.Atkinson2@usdoj.gov
Bryan.Seeley@usdoj.gov

DATED: August 21, 2012

-24-